UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-CR-160 (23)(NEB/JFD)

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **DEFENDANT'S** |
| v. ) | **MOTION TO DISMISS** |
| ) | |
| Earnest Boyd, ) | |
| ) | |
| Defendant. ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The defendant, Earnest Boyd, through and by his lawyers, Charles L. Hawkins and Arthur J. Waldon IV, hereby moves the Court pursuant to Rule 12 (b)(3)(A)(iv), and in accordance with the standards established in United States v. Armstrong, 517 U.S. 456 (1996) and its progeny, for an Order dismissing the Second Superceding Indictment for reasons of selective prosecution and the concomitant denial of his right to equal protection under the law. Mr. Boyd is being prosecuted in a RICO conspiracy indictment because he is Black.

Our grounds are these:

1. Armstrong describes our selective prosecution claim as "not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the change for reasons forbidden by the Constitution." Id. at

1

463. The DOJ's "'broad discretion' to enforce the National criminal laws," Id at 464 (quoting Wayte v. United States, 470 U.S. 598, 607 (1985)) has never been beyond judicial review. That discretion is "subject to constitutional constraints." Id. (quoting United States v. Batchelder, 442 U.S. 114, 125 (1979)).

2. One such constraint is "imposed by the equal protection component of the Due Process Clause of the Fifth Amendment." Id. (citing Bolling v. Sharpe, 347 U.S. 497, 500 (1954)). To that end, "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" Id. (quoting Oyler v. Boles, 368 U.S. 448, 456 (1962)).

3. There is, of course, a presumption of regularity that supports prosecutorial decisions. Id. (citing United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926). To dispel that presumption here, Mr. Boyd must offer "clear evidence to the contrary." Id. at 465 (citing Chemical Foundation, at 14-15). There has to be a showing of "discriminatory effect" within the prosecutorial decision to pursue a purported Black Highs gang under the RICO conspiracy indictment. "To establish a discriminatory effect in a race case," Mr. Boyd thus "must show that similarly situated individuals of a different race were not prosecuted." Id. at 465 (citing Ah Sin v. Wittman, 198 U.S. 500 (1905)).

The burden for Mr. Boyd is to "produce some evidence that similarly

defendants of other races could have been prosecuted, but were not," consistent with the Supreme Court's "equal protection case law." Id. at 469 (citations omitted; emphasis added). The word "some" is not defined. Rather, the Supreme Court announced: "We think the required threshold – a credible showing of different treatment of similarly situated persons – adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecutions." Id. at 470. The phrase a "credible showing" was left unsaid.

4. In Armstrong, the defense proof of selective prosecution – a newspaper article, an affidavit recounting "one attorney's conversation with a drug treatment center employee and the experience of another attorney defending drug prosecutions in state court" – were deemed "anecdotal" and insufficient. Id. at 470. The record generated in Armstrong just wasn't good enough. The Supreme Court left for the lower Courts to answer the question of what kind of burden would suffice.

5. That answer is found in Floyd v. City of New York, 959 F. Supp.2d 540 (S.D.N.Y. 2013). There the plaintiffs brought a Monell civil rights action, claiming the New York City Police Department's stop and frisk policy unfairly targeted Blacks, and thus was a denial of the Equal Protection Clause. District Court Judge Shira A. Scheidlin used a statistical analysis, as opposed to newspaper articles or a lawyer's subjective affidavit in Armstrong, to rule that the "Equal Protection Clause

3

does not permit the police to target a racially defined group as a whole because of the misdeeds of some of its members." Id. at 563.

The Court initially found an equal protection claim, the predicate for a selective prosecution claim, is found once the defendant "can show (1) that a facially neutral law or policy has been applied in an intentionally discriminatory manner." Id. at 558. And "[b]ecause there is rarely direct proof of discriminatory intent, circumstantial evidence of such intent is permitted." Id. at 558. "The impact of the official action – whether it bears more heavily on one race than another – may provide an important starting point." Id. (quoting Hayden v. Paterson, 594 F.3d 150, 163 (2nd Cir. 2010)).

In Floyd, the District Court found a denial of equal protection for five reasons:

> (1) the NYPD carrie[d] out more stops where there are more black and Hispanic residents, even when other relevant variables are held constant. The racial composition of a precinct or census tract predicts the stop rate above and beyond the crime rate. (2) Blacks and Hispanics are more likely than whites to be stopped within precincts and census tracts, even after controlling for other relevant variables. This is so even in areas with low crime rates, heterogenous populations, or predominately white populations. (3) For the period of 2004 through 2009, when any law enforcement action was taken following a stop, blacks were 30% more likely to be arrested (as opposed to receiving summons) than whites, for the same suspected crime. (4) For the period of 2004 through 2009, after controlling for suspected crime and precinct characteristics, blacks who were stopped were 14% more likely – and Hispanics 9% more likely – than whites to be subjected to the use of force. (5) For the period of 2004 through 2009, all else being equal, the

4

> odds of a stop resulting in any further enforcement action were 8% <u>lower</u> if the person stopped was black than if the person stopped was white. In addition, the greater the black population in the precinct, the less likely that a stop would result in a sanction. Together, these results show that blacks are likely targeted for stops based on a lesser degree of objectively found suspicion than whites.

<u>Id</u>. at 560 (emphasis in original).

6. <u>Floyd</u> wasn't a RICO case, we know. But the Court's equal protection analysis, coupled with over 700 footnotes, is definitive. What's important, for Mr. Boyd's claim in this case, was the finding that law enforcement efforts in New York City were "being conducted in a racially skewed manner." And, just as important, "[n]othing was done in response." The NYPD leadership, having knowledge of the discrimination, imposed discipline that was "spotty or non-existent, [with] little done to improve the situation." <u>Id</u>. at 561.

Hence the critical ruling finding in <u>Floyd</u> that the NYPD engaged in "deliberate indifference," once having been made aware of the evidence of racial bias. <u>Id</u>. at 560. Given the deficient managerial efforts within the NYPD to stop discriminatory enforcement (as shown by statistical analysis), there was sufficient proof of "a reasonable inference of discriminatory intent . . ," an intent shown by failures of "supervision, monitoring, training and discipline." <u>Id</u>. at 666.

"Indeed," the District Court found, "the targeting of certain races within the

5

universe of suspicious individuals is especially insidious, because it will increase the likelihood of further enforcement actions against members of those races as compared to other races, which will then increase their representation in crime statistics." Id. at 667. "Equal protection guarantees that similarly situated individuals of these races will be held to account equally." Id. at 667. Equal protection the Black citizens of New York did not receive. The Court's ultimate finding was that, in New York City, "minorities are indeed treated differently than whites." Id. at 562. Which comports with the Armstrong standard; proof of a "credible showing of different treatment of similarly situated persons." 517 U.S. at 470. Thus, the NYPD had violated "the Plaintiffs' Fourth and Fourteenth Amendment rights." Floyd, 959 F.Supp.2d at 667.

    7. The construct used in Floyd frames the DOJ's use of the RICO indictment to unfairly and unconstitutionally target an inner-city Black gang in North Minneapolis. We look first to see if one race is treated by law enforcement differently by use of neutral statistics instead of anecdotal opinion. If so, then the question becomes what, if anything, the police department at issue did about the apparent prejudice. And if nothing was done in the face of known bias, an equal protection claim like ours has vitality. And there must be a remedy.

    8. Recent scholarship is helpful. Lucy Litt's definitive article, "RICO:

Rethinking Interpretations of Criminal Organizations," Berkeley Journal of Criminal Law, 26:2 (2022) makes the claim we make in the motion: that the "[a]pplication of the RICO Act to alleged neighborhood gangs is both fueled by and continues to perpetuate systemic racism in the United States." Id. at 145. She suggests the Floyd method of analysis apply to RICO prosecutions to determine the claim of inappropriate selectivity, a denial of equal protection. Id. at 79.

9. Ms. Litt contends, as do we, that "State and federal law enforcement's pretextual use of 'gang prevention' to justify racial profiling perpetuates inequity and racism by disproportionately and inappropriately labeling young Black and Brown men as gang members for RICO prosecution. Such neighborhood gangs do not wield a fraction of the power and influence of the state's true original target: the Mafia." Id. Moreover, "[t]hese 'gangs' are often groups of friends that are rarely 'organized,' and they demonstrably do not threaten legitimate businesses." Id.

10. Ergo, given its legislative history, the RICO statute was not designed for the amorphous, often informal, neighborhood groups to which it is now being applied." Id. at 85.

11. Ms. Litt's extensive research focuses on the question of whether federal RICO prosecutions "have an inappropriate and disproportionately negative impact on young Black and Brown men and adolescents in low-income communities." Id.

7

at 74-76. She finds the common use of gang databases, where young people of "color are over-represented," is a key factor in "driving their over-representation in gang raids and RICO prosecutions." Id. at 77.

12. "Law enforcement agencies rely on inaccurate and biased racial stereotypes when they attempt to identify gang members, and this misplaced reliance heavily influences the accuracy and demographic makeup of gang databases and 'gang-related' RICO defendants." Id. at 91. Similar databases in Boston, Chicago, Los Angeles and New York "have all been criticized for serious inaccuracies." Id. at 92. The recent DOJ report, discussed below, offers no reason to think Minneapolis is unique in this regard.

As Ms. Litt points out, "there are rarely any internal mechanisms to correct gang database inaccuracies (to the extent that is even possible in such a flawed system)." Id. at 94. The problem with the over-representation of Black and Brown men in the databases, is that labeling of members has a "disproportionately negative impact on low-income urban communities of color, especially young Black and Brown men in those communities." Id. at 100. For example, in New York City, less than 1% of the identified gang members in the databases is white. Id. at 130. Ms. Litt contends that "[u]ltimately, the over-representation of young Black and Brown men in flawed databases, and law enforcement reliance on those databases, drives

8

the racial disparities in RICO 'street gang' cases." Id. at 101. Like this one.

13. Then she addresses the "unaddressed convergence of racial profiling, gang policing and prosecution practices and the RICO Act." Id. at 80. Her research was initially blocked by the Government's policy of secrecy. "The Department of Justice ("DOJ") does not share information with the public about the alleged gangs it prosecutes. Under RICO, groups it chooses not to label as gangs, and groups it declines to prosecute as gangs under RICO." Id. at 81. "DOJ data limitations create challenges to proving racial basis or racially disparate outcomes in federal criminal RICO 'street gang' prosecutions." Id. at 82. But from available sources, including reports and indictments, Ms. Litt concludes that there is "overwhelming evidence that young Black and Brown men from low-income communities are the primary suspects who are later convicted and harshly sentenced through federal RICO prosecutions." Id. at 83.

14. Even without DOJ data, Ms. Litt's article ends her article with irrefutable numbers, a charting of RICO defendants from 2015-2019. In almost every category (broken down by age and gender), Blacks are by far and away over-represented not only by numbers, but when compared to their percentage of the population. Id. at 150-153. For all of the RICO defendants under the age of 25 years, for example, 85% were Black. Id. at 150. Recent census data as the Black population in the United

9

States, from whatever source, is less than 15%.

15. The harm to the Black defendant is in the sanctions. The higher prison time penalties afforded by the RICO guidelines (which is why this case has been brought) punish the Black community disproportionately. For example, the Montez Brown RICO plea agreement, Docket Entry 449, with acceptance of responsibility, has a range of 37. Id. at para. 36. If he had not plead out, his guidelines would have been 360 to life.

For those defendants in this case who have already been convicted of a murder referenced in the Second Superceding Indictment, their range is limited to life, even though their state court pleas assured an eventual release after a long sentence. For example, First Degree murders in the United States Guidelines call for a life sentence. Sec. 2A1.1. Second Degree murders start out at a level 38, with upward departures available if the defendant's conduct was "heinous, cruel, brutal, or degrading to the victim." Sec. 2A1.2, App. N. 1. Most murders feature one of those characteristics. Murder, by definition, is a savage act.

16. There is more authority yet. In our companion Brady motion, we discuss Professor Jordan Blair Woods' article: "Systemic Racial Bais and RICO's Application to Criminal Street and Prison Gangs," Vol 17 Michigan Journal of Race and Law, issue 2, pp. 303-357, where he addressed RICO prosecutions of the Black

community. We incorporate our discussion in the Brady motion here.

He offers a similar kind of proof used in the Floyd decision to find a RICO Equal Protection violation. Professor Woods' own exhaustive review of DOJ RICO indictments "suggests that the government has targeted relatively small and local groups of racial minority offenders, provided names for the groups, and labeled the groups as gangs even though the suspects disagreed with 'gang' labels. These cases illustrate that racial stereotypes can shape the ways in which the government constructs gang phenomena." Id. at 309.

Though Professor Woods could not, definitively, "prove that RICO gang prosecutions are driven by systemic racial bias," he found the data "cast considerable doubt over whether current application of RICO to prosecute gangs is a racially unbiased process." Id. at 311. He didn't apply the right standard.

17. For this motion, we don't need definitive proof. We just have to show "the required threshold – a credible showing of different treatment of similarly situated persons – adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecutions." Armstrong, 517 U.S. at 470. Professor Woods' article does that for us. As of 2014, when his article was published, Professor Woods studied 160 prosecutions brought against 115 separately named street and prison gangs and 2,915 alleged gang

members/affiliates." Id. at 328-29. He found 83% of the defendants were affiliated with a minority group, mostly Latino (40%) and Black (37.5%), Id. at 319, Table 1. The white gangs, in the small minority of prosecutions, involved, for example, the Hells Angels, and "white supremacist prison gangs," such as the Nazi Low Riders. Id. at n. 131.

18. The Government may attempt to say its RICO prosecutions are race-neutral. We welcome the argument. Because once made we'll get to see the DOJ's internal RICO data which, as Ms. Litt points out, has been heretofore unavailable to the public. If the enforcement of RICO does not disproportionately affect low-income Black communities, the DOJ should be made to say why not, and point to the data. Our companion discovery motion asks for this data if it is omitted from the government's response.

19. What this local United States Attorney's Office cannot undercut is the DOJ report concerning the Minneapolis Police Department's racial bias, a bias that has resulted in this prosecution. The report is also summarized in our Brady motion.

Note, for this motion's purposes, the DOJ's opening heading: "MPD Unlawfully Discriminates Against Black and Native American People When Enforcing the Law." Id. at p. 1. The DOJ's report finds "reasonable cause to believe that MPD engages in racial discrimination in violation of Title VI of the Civil Rights

12

Act of 1964 and the Safe Streets Act. These statutes prohibit law enforcement practices that have an unjustified disparate impact based upon race. Police practices that disproportionately affect people based on their race are unlawful unless there is a substantial, legitimate, non-discriminatory justification." Id. at 31 (citing 42 U.S.C. 2000d; 28 C.R.F. Sec. 42.104(b)(2); 28 C.F.R. Sec. 42.203).

20. The DOJ has found the proof sufficient in Floyd, i.e., the disproportionate stops of Black and Native Americans when compared to the racial composition of their respective neighborhoods. We also have what the Floyd court found significant, a lack of response to evidence bias. That the MPD had "long been on notice about racial disparities and officers' failure to document data on race during stops, and was made aware of expressions of racial bias by some MPD officers and supervisors, MPD has insufficiently addressed these issues." Id. at 31.

21. Beyond any doubt, the DOJ acknowledges that when compared to Whites, Blacks stopped by the MPD were subject to 22% more searches, 37% more vehicle searches, and 24% more uses of force. Id. at 37. And the report concludes, as did Professor Woods, and Ms. Litt, that MPD's "racial discrimination . . . has taken a toll on its relationship with the community." Id. at 47.

22. A police failure to address the bias toward the Black community, in training, reporting and discipline, was a key consideration in Floyd, 959 F. Supp.3d

13

at 666. The failure of the police department leadership proves "a reasonable inference of discriminatory intent." Id. The DOJ has found that causes of the discrimination was found in the MPD's leadership's failure to address "officer misconduct." Id. 77-78. This is the "skewing" we need to show.

23. The DOJ has already determined that MPD has denied the Black community in Minneapolis equal protection of law. This prosecution mirrors that said default, and reflects the national trend to use a statute designed to eliminate the mafia to further assist in the destruction of the Black community. This prosecution is unfairly selective, constitutionally prohibited.

We reserve further briefing on this issue after the DOJ discloses our requests for data underlying RICO prosecutions of the Black communities across the United States, when compared to indictments filed against white gangs.

On behalf of Mr. Boyd and Co-Defendant Robinson, Robinson's counsel Paul Engh met and conferred with AUSA Samantha Bates and others regarding this motion. Mr. Engh was advised the Government objected to this motion.

                                  Respectfully submitted,

Dated: April 25, 2024                */s/Charles L. Hawkins*
                                  Charles L. Hawkins #124369
                                  150 S. Fifth Street, Suite 2860
                                  Minneapolis, MN 55402
                                  612-339-6921
                                  clhcrimlaw@yahoo.com

                                  */s/Arthur J. Waldon*
                                  Arthur J. Waldon #0397729
                                  P.O. Box 1242
                                  Lakeville, MN 55044
                                  612-719-0625
                                  arthur@waldonlawmn.com

                                  *Lawyers for Defendant Ernest Boyd*